## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| THE HOOVER CITY BOARD OF EDUCATION, | } } } | |
| Plaintiff/Counter Defendant, | } } | |
| v. | } } | Case No.: 2:16-cv-01822-MHH |
| RICHARD LEVENTRY, individually, and as guardian, custodian, and legal representative of K.M., a minor, | } } } } } | |
| Defendant/Counter Claimant. | } } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Hoover City Board of Education challenges the decision of an administrative hearing officer who determined that the Board may have denied K.M. a free appropriate public education because of procedural flaws in the Board's assessment of K.M.'s eligibility for special education and related services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.* The hearing officer ordered the Board to reconsider whether K.M. is eligible for special education and related services because the Board did not have sufficient information to make a determination at the eligibility hearing. The Board seeks a judgment in its favor on the administrative record. So does defendant Richard Leventry on behalf of K.M. For the reasons set forth below, the Court enters judgment in favor of Mr.

Leventry.

## I.     STATUTORY BACKGROUND

The IDEA ensures that "children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living . . . ." 20 U.S.C. § 1400(d)(1)(A). Under the IDEA, a "child with a disability" may be a child with an intellectual or learning disability or a child with a serious emotional disturbance or a health impairment who, by virtue of the disability, "needs special education and related services." 20 U.S.C. § 1401(3)(A).[1] Under the IDEA, a "free appropriate public education" (FAPE) is:

> special education and related services that--
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

---

[1] The IDEA covers other physical disabilities too, but those categories of disability are not relevant here.

20 U.S.C. § 1401(9)(A)-(D).

"Special education" means "specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability." 34 C.F.R. § 300.39(a)(1). "Specially designed instruction" means:

> (3) . . . adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction—
>
> > (i) To address the unique needs of the child that result from the child's disability; and
> >
> > (ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

34 C.F.R. § 300.39(b)(3). "Related services" are:

> transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education, and includes speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, early identification and assessment of disabilities in children, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services for diagnostic or evaluation purposes. Related services also include school health services and school nurse services, social work services in schools, and parent counseling and training.

34 C.F.R. § 300.34.

States that receive federal funds through the IDEA must engage in "child find," a process designed to ensure that "[a]ll children with disabilities residing in the State, . . . regardless of the severity of their disabilities, and who are in need of

special education and related services, are identified, located, and evaluated . . . ." 20 U.S.C. § 1412(a)(3)(A). The "child find" process "must include . . . [c]hildren who are suspected of being a child with a disability . . . and in need of special education ...." 34 C.F.R. § 300.111(c)(1). When the state suspects that a child may be a child with a disability, the state must evaluate the child to determine whether the child is eligible to receive an individualized education plan, commonly called an IEP. 20 U.S.C. §§ 1414(a)(1)(A), (d)(1)(A)(i).

To determine whether a child is eligible for special education and related services under the IDEA, a state educational agency first must "conduct a full and individual initial evaluation" of a student who may have a disability. 20 U.S.C. § 1414(a)(1)(A). Then "a team of qualified professionals and the parent of the child" must determine whether the child is a "child with a disability" as defined by the IDEA and thus eligible "for special education and related services." 20 U.S.C. § 1414(b)(4)(A). If the team determines that the child is a "child with a disability" who is eligible for special education and related services, then the team must develop and the state agency must implement an IEP for the child. 20 U.S.C. §§ 1414(d)(1)(A)(i), (2)(A). Consistent with the least restrictive environment (LRE) requirements applicable to IEPs, the state educational agency "must ensure that . . . [t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children

who are nondisabled[.]" 34 C.F.R. § 300.114(a)(2)(i); *see also* 20 U.S.C. § 1412(a)(5)(A)-(B) (IDEA's LRE provisions); https://sites.ed.gov/idea/acronyms/#L (last visited Apr. 8, 2019).

This litigation concerns the team meeting phase of K.M.'s FAPE evaluation. During the team meeting, the team members discussed not only the resources available to K.M. under the IDEA but also the resources available under the Rehabilitation Act. Under section 504 of the Rehabilitation Act, a public school district that receives federal funds must provide reasonable accommodations to a student with a disability to ensure that the student is not "excluded from the participation in," "denied the benefits of," or "subjected to discrimination" in public education "solely by reason of her or his disability." 29 U.S.C. § 794(a). A disabled student under the Rehabilitation Act has "physical or mental impairments [which] substantially limit his ability to learn and participate in a classroom environment." *See J.S.R. by Childs v. Dale Cty. Bd. of Educ.*, No. 1:13–CV–582–WKW2015, WL 5692804, at *4 (M.D. Ala. Sept. 28, 2015) (citing 34 C.F.R. § 104.35(a)). "All children with disabilities under the IDEA, as well as some children who are ineligible for special education under the IDEA, are [] protected by § 504 of the Rehabilitation Act." *J.S.R.*, 2015 WL 5692804, at *3. An IEP created under the IDEA satisfies § 504's requirements. *J.S.R.*, 2015 WL 5692804, at *4 (citing *K.D. v. Starr*, 55 F. Supp. 3d 782, 785 n.3 (D. Md. 2014)). But an education plan created

for a student under the Rehabilitation Act may not meet the IDEA's FAPE requirements. *See J.S.R.*, 2015 WL 5692804, at *4. The distinction is significant for purposes of this case.

## II. FACTUAL BACKGROUND

### A. K.M.'s Impairments

When the FAPE process in this case began, K.M. was a student in the tenth grade at Hoover High School, a public school that the Board operates. In mid-2015, K.M. experienced significant trauma. Her half-brother sexually abused her. (Doc. 15-1, pp. 34-35, 179). K.M.'s mother, who worked at Hoover High School, was physically aggressive towards K.M. at school. (Doc. 15-1, pp. 34-35, 182-85). As a result, K.M. began spending 15 to 17 hours a day with Mr. Leventry and his family. K.M. moved into the Leventry home on December 3, 2015. (Doc. 15-1, p. 29). Mr. Leventry is K.M.'s court-appointed guardian. (Doc. 15-33, pp. 2-4).

K.M. struggled with the transition to a new household and with the memories of her experiences with her mother and her half-brother. Throughout the 2015-16 school year, she suffered from extreme anxiety and frequently had severe panic attacks at school. (Doc. 15-1, pp. 48-53). She had convulsions, hallucinations, and memory loss. (Doc. 15-1, pp. 39-40, 81-82, 92-96). She fainted frequently and was often transported by ambulance from school to a hospital. (Doc. 15-1, pp. 53-54, 80-81). K.M. was absent from school for many days because of these emergencies.

(Doc. 15-1, p. 48).  As a result, her grades faltered.  (Doc. 15-1, pp. 209-10).

The school's guidance counselor, Zach Butler, met regularly with K.M.  (Doc. 15-1, pp. 179-81, 187-89, 200).  In January 2016, Mr. Butler asked teachers to give K.M. extra time to complete assignments and to allow her to freely visit him.  (Doc. 15-1, pp. 198-200).  Mr. Butler also referred K.M. to a problem solving team (PST), a group of teachers and administrators at the school who collaborate to develop interventions for struggling students.  (Doc. 15-1, pp. 201, 210-13).  On February 24, 2016, to accommodate K.M.'s absences, the PST implemented extended time for K.M. to finish her assignments following absences.  (Doc. 15-1, p. 212; Doc. 15-15, pp. 1-2).  Despite the accommodation, KM. failed her history class.  (Doc. 15-1, pp. 211-12).

Katie Vines, a licensed professional counselor, was K.M.'s treating therapist.  (Doc. 15-2, pp. 14, 18).  Ms. Vines began treating K.M. on March 2, 2016.  (Doc. 15-2, p. 18).  K.M. explained to Ms. Vines that she had endured extensive abuse and neglect in her parents' home; that her mother physically abused her, and her father emotionally neglected her; that her mother assaulted her at school, and her half-brother sexually abused her.   K.M. described panic attacks, feelings of worthlessness, hopelessness, sleep disturbances, emotional difficulties, attachment difficulties, social difficulties, and pseudo seizures.  (Doc. 15-2, pp. 18-19).

Ms. Vines specializes in working with patients who suffer from these kinds

of abusive conditions.  (Doc. 15-2, pp. 10-11).  Ms. Vines met with K.M. at least bi-weekly for 55 minutes at a time.  (Doc. 15-2, p. 20).  Ms. Vines diagnosed K.M. with post-traumatic stress disorder (PTSD) and conversion disorder.  (Doc. 15-2, p. 21).  Ms. Vines was licensed to diagnose these disorders and had many years of experience working with patients who suffer from PTSD.  (Doc. 15-2, pp. 8-14). K.M. was Ms. Vines's first patient with conversion disorder.  (Doc. 15-2, p. 12). Conversion disorder "is a mental condition in which a person has blindness, paralysis, or other nervous system (neurologic) symptoms that cannot be explained by medical evaluation."[2]  Ms. Vines testified that conversion disorder is "physiological or neurological in nature, but there is no medical explanation for it." (Doc. 15-2, p. 12).  Ms. Vines diagnosed K.M. with conversion disorder because K.M. experienced pseudo seizures, which Ms. Vines testified are real seizures without the EEG activity of a seizure in the brain.  (Doc. 15-2, pp. 12-13).

On March 21, 2016, Ms. Vines sent Mr. Butler a letter in which she stated that she had been treating K.M. for PTSD and conversion disorder; that K.M. attended regular therapy sessions; that K.M. was "coping with many complex stressors in a small amount of time"; that K.M.'s anxiety and panic attacks had "stabilized greatly over the past few weeks"; that K.M. could return to school; that K.M. occasionally exhibited pseudo seizures and fainting spells "during moments of distress or when

---

[2] https://medlineplus.gov/ency/article/000954.htm (last visited Apr. 12, 2019).

recalling unpleasant memories," but that those incidents had "greatly decreased"; that K.M. might still faint or have a pseudo seizure at school; that K.M. would utilize coping strategies; that "normalcy and routine are best during times of stress thus returning to school and [K.M.'s] normal routine is vital to helping her recover"; and that K.M.'s absences should be excused. (Doc. 15-36).

Near the end of March 2016, K.M. transitioned from Hoover High School to New Beginnings, a program in a separate facility that the Board operates for students who are not able to succeed in their assigned school due to emotional, social, or physical limitations. (Doc. 15-2, pp. 118, 161). K.M. transferred to New Beginnings because she needed to catch up on her school work, Mr. Leventry could not afford K.M.'s frequent ambulance transports, and K.M. could not cope with attending school in the same building as her mother. (Doc. 15-1, p. 82). New Beginnings offered K.M. her academic courses from Hoover High School in a smaller environment and provided K.M. regular guidance and intervention counseling. (Doc. 15-2, pp. 118, 162-64, 175).

Between March 23 and May 20, 2016, while she studied at New Beginnings, K.M. had at least 12 pseudo seizures. (Doc. 15-168, pp. 1-2; *see* Doc. 15-2, pp. 150-53). While at school in early May 2016, K.M. fainted, fell to the ground, hit her head on concrete, dislocated her shoulder, and suffered a concussion. (Doc. 15-1, p. 80). She spent four days in the hospital following the incident and had nine panic

attacks during the first day in the hospital. (Doc. 15-1, p. 81). On May 20, 2016, she had a particularly severe pseudo seizure and talked out loud about hallucinations she was experiencing for two hours and 20 minutes. (Doc. 15-2, pp. 142-43, 153; *see* Doc. 15-168, p. 2). She did not return to New Beginnings after this episode. (Doc. 15-1, p. 94; Doc. 15-2, p. 153). Through a summer recovery program, she earned the credit for the class she had failed. (Doc. 15-1, pp. 218, 237-39).

### B.  Mr. Leventry's Due Process Complaint

On March 3, 2016, on behalf of K.M., Mr. Leventry filed a complaint for due process in the Alabama Department of Education, Special Education Division. (Doc. 15-21, pp. 1-7). A party may bring a complaint for due process "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child . . . ." 20 U.S.C. § 1415(b)(6)(A). In his complaint, Mr. Leventry alleged that the Board failed to provide K.M. a FAPE by failing to identify and evaluate K.M. as a suspected child with a disability pursuant to the Board's IDEA "child find" obligations, and that the Board failed to develop and implement an adequate IEP. (Doc. 15-21, pp. 2-3). Among other prayers for relief, Mr. Leventry asked for an order directing the Board to identify and evaluate K.M. in all areas of suspected disability "within 30 days of reaching an agreement." (Doc. 15-21, p. 5).

## C.    The Eligibility Determination

The Board treated Mr. Leventry's due process complaint as a parental referral for an initial evaluation pursuant to the first step of the FAPE process.  (Doc. 15-3, pp. 48-50).  Near the end of March 2016, the Board agreed to evaluate K.M.  (Doc. 15-170, p. 4; Doc. 15-171, pp. 4-5).  From March 2016 to May 2016, the Board evaluated K.M. in several areas:  achievement; behavior rating scales; documentation of accommodations, interventions implemented, appropriate instruction, prolonged emotional impairment, and adverse effect of educational performance; environmental, cultural, language, and economic concerns; hearing; intelligence; structured and unstructured observation; motor skills; structured interviews with K.M., her family, and teachers; and vision.  (Doc. 15-85, pp. 1-7).

On June 22, 2016, pursuant to the second step of the FAPE process, the IDEA eligibility team met to analyze the evaluation data and determine whether K.M. was eligible for special education.  (*See* Docs. 15-85, 15-172).  The IDEA eligibility team consisted of two Hoover High School teachers, Gail Flynn and Patricia Gwynn; Mr. Butler; the Board's director of instructional support, Dr. Barbara Mayer; the Board's consulting clinical psychologist, Dr. Teashia Goodwin; the Board's attorney, Carl Johnson; the Hoover High School assistant principal, Brad Hayn; K.M.'s attorneys, Shane Sears and Jim Sears; Mr. Leventry and his wife, Tracy Leventry; and Anna Whitney, the principal of Crossroads, the school that operated New Beginnings.

(Doc. 15-3, pp. 50-52, 222-23; Doc. 15-172, p. 1).

For K.M. to be eligible for special education under Alabama law, her disability must have: (1) met the criteria for one of 13 disabilities listed in the Alabama Administrative Code; (2) had an adverse effect on her educational performance; and (3) required her to have specially designed instruction in order to access and participate in the general education curriculum. Ala. Admin. Code § 290-8-9-.03; 34 C.F.R. § 300.39(b)(3). All members of the eligibility team agreed that K.M.'s disability met the first two requirements, but disagreed as to the third. (Doc. 15-3, p. 350; Doc. 15-85, p. 9; Doc. 15-172, p. 4).

Mr. Hayn took notes during the eligibility team meeting. (Doc. 15-3, p. 348; Doc. 15-172). Mr. Hayn's notes state that when the team considered whether K.M.'s disability satisfied the third requirement, "[t]he discussion centered on what [] main special education service she would require" versus a plan under the Rehabilitation Act. (Doc. 15-172, p. 3).

Dr. Mayer said that whether K.M. needed specially designed instruction was a "hard question to answer." (Doc. 15-172, p. 3). Dr. Goodwin talked about "several things" that all members of the team agreed K.M. would need to be successful. (Doc. 15-172, p. 3). Dr. Goodwin and Ms. Whitney agreed that they were stuck on whether K.M. needed "specialized instruction." (Doc. 15-172, p. 3). Mr. Butler discussed how the school could offer "Academic Success as a class that is not special

education" if the team went "the PST/504 route." (Doc. 15-172, p. 3). Mr. S. Sears asked about a "resource room." (Doc. 15-172, p. 3). Ms. Gwynn explained the differences between "Study Strategies and Academic Success" at the school. (Doc. 15-172, p. 3). Ms. Whitney agreed with all the points made and continued to ask about "what specifically designed instruction was needed in order to access the curriculum." (Doc. 15-172, p. 3). Mr. J. Sears said K.M. needed a place to go "when things are not going well." (Doc. 15-172, p. 3). In response, Dr. Goodwin said K.M. could go to a counselor, not a special education teacher. (Doc. 15-172, p. 3). Mr. Butler explained that it was normal for K.M. to talk to him and that the school had a social worker on staff. (Doc. 15-172, p. 3). Mr. Butler said that the school could also provide a virtual classroom to afford K.M. more time to finish school work. (Doc. 15-172, p. 3).

Mr. Butler then "talked about what a 504 plan would look like at the school." (Doc. 15-172, p. 3). He said that the 504 plan could include "Academic Success" as a class rather than as special education, counseling with a counselor and social worker for anxiety and depression, extending time on assignments and tests, using the "Learning Lab" to take tests, affording K.M. extra time through virtual classes and then "staging her back into the classroom," and accommodating "seizure like episodes." (Doc. 15-172, p. 3).

K.M.'s attorneys continued to ask about specially designed instruction rather

than a 504 plan. (Doc. 15-172, pp. 3-4). Mr. S. Sears said that K.M. "needed specially designed instruction," but "people from the school are stating that we can do it through a 504." (Doc. 15-172, p. 4). Ms. Whitney said that she was not sure what goals and benchmarks would come with an IEP. (Doc. 15-172, p. 3). Ms. Whitney talked about how she "witnessed the issues with K.M. and Mr. Leventry agreed with all of her support." (Doc. 15-172, p. 4). Mr. S. Sears asked what the school would do about K.M.'s biological mother, and Mr. Hayn said that was irrelevant to the eligibility team's discussion and the team "needed to focus on the specialized instruction." (Doc. 15-172, p. 3). Mr. Hayn said that special education does not guarantee that a student will pass her classes, and K.M.'s attorneys said that they were not trying to say that. (Doc. 15-172, p. 4).

The school representatives then asked K.M.'s attorneys what the specially designed instruction would like, and Mr. J. Sears "talked about some ideas in reference to transition and behavior." (Doc. 15-172, p. 4). Ms. Whitney asked if those ideas were instructional, and Mr. J. Sears "talked about the social/emotional pieces." (Doc. 15-172, p. 4). Dr. Mayer said the school could "handle that through a 504." (Doc. 15-172, p. 4).

Mr. Johnson then "asked that if the majority of the team agreed that the student does not meet the needs for an IEP, then what would happen." (Doc. 15-172, p. 4). Dr. Mayer said that the school could reconsider K.M. for special education within a

year "if other measures are unsuccessful."  (Doc. 15-172, p. 4).  Dr. Goodwin stated

that the Leventrys' concerns "seem[ed] to be academic," so she "wanted to know

what a 504 could do to assist."  (Doc. 15-172, p. 4).  Mr. Butler responded that the

school could extend the academic year if K.M. needed extra time to finish her classes

"in addition to other 504 accommodations that are provided to students."  (Doc. 15-

172, p. 4).

Ultimately, the school representatives stated that they did not see the need for

specially designed instruction.  (Doc. 15-172, p. 4).  Dr. Goodwin said that K.M.

"definitely needs support but not necessarily special education."  (Doc. 15-172, p.

4).  On the eligibility decision form, the team marked "No" for the question, "does

the student need specially designed instruction in order to access and participate in

the general education curriculum," and therefore found that K.M. was not eligible

for an IEP.  (Doc. 15-85, p. 9).  The form states: "The team considered emotional

disability but school personnel feels that [K.M.'s] needs can be met through a 504

plan."  (Doc. 15-85, p. 9).  The Leventrys and K.M.'s attorneys signed the eligibility

decision form indicating that they disagreed with the team's decision.  (Doc. 15-85,

p. 9).

### D.      The Due Process Hearing and Decision

The due process hearing on Mr. Leventry's complaint took place on July 18,

19,  20 and August 3, 2016.  (*See* Docs. 15-1, -2, -3, and -4).  Mr. Leventry did not

amend his due process complaint to add a challenge to the eligibility team's decision, but the Board consented to Mr. Leventry bringing the challenge at the hearing, and the hearing proceeded on that claim in addition to Mr. Leventry's allegation that the Board violated "child find."  (Doc. 15-1, pp. 16-20).

Ten witnesses testified at the hearing, and the parties submitted 91 exhibits. (*See* Docs. 15-1, -2, -3, and -4).  Dr. Goodwin testified for the Board.  (Doc. 15-3, pp. 254-323).[3]  On September 14, 2016, the hearing officer entered his decision on Mr. Leventry's due process complaint.  (Doc. 15-243, p. 12).  The hearing officer found that the Board did not violate "child find."  (Doc. 15-245, pp. 5-11).  But he found that the eligibility team's evaluation of K.M. eligibility for specially designed instruction was flawed.  The hearing officer stated:

> Simply put, if the answer by the team was that since we do not know what services could be put in place, or we could not imagine any services that would help, and therefore we do not think the child is a person who needs specially designed services, does not properly address the question and conceivably would deny the child a FAPE.  It is this particular question that gives the undersigned pause and which requires attention in order to determine if a FAPE may have been denied the child during the Eligibility process.

(Doc. 15-246, p. 4).  The hearing officer commended the Board's professional and serious efforts regarding K.M., but found that "there appears to be a glitch in the

---

[3] Dr. James Alan Siders testified as an expert in special education for Mr. Leventry.  (Doc. 15-4, pp. 98-142). Dr. Siders was not part of the eligibility team.  The parties give some attention to his testimony in their briefs, but Dr. Siders's testimony is mostly immaterial to the issues in this appeal, so the Court has not presented the details of his testimony in the factual background.

thinking process where the team appears to back into the decision that since they do not see any services that might help, they think that [K.M.] would not therefore benefit from specialized instruction."  (Doc. 15-246, p. 5).

The hearing officer relied heavily on the eligibility team meeting minutes prepared by Mr. Hayn.  (*See* Doc. 15-246, pp. 6-9).  The hearing officer found that, according to the meeting minutes, "the eligibility team appears to determine that what really is needed are modifications by the general education teacher, along the lines of a formal 504 plan, since they could not imagine what specially designed instruction might be provided . . ."  (Doc. 15-246, p. 6).  The hearing officer explained that K.M.'s attorneys asked about specially designed instruction accommodations, but "[a]ll answers seem to move back to a 504 plan as opposed to a true or vigorous discussion about what specially designed instructions could be available and if they were, were they needed."  (Doc. 15-246, p. 6).  The hearing officer stated that "the minutes of the meeting appear to support the contention . . . that the team never fully evaluated any specific specially designed instructions as a remedy and consequently, never ruled any such instructions out as unnecessary for the child."  (Doc. 15-246, p. 6).

The hearing officer also found that members of the eligibility team were not adequately prepared and that the team did not develop sufficient information to permit a sound evaluation of K.M.'s eligibility for special education.  The hearing

officer pointed out that Dr. Goodwin had "reviewed records of K.M., but had not obtained any personal knowledge of K nor her guardians as to her history." The hearing officer stated that Dr. Goodwin did not "truly examine[] the child" or seek "a full history of the events occurring before the June eligibility meeting." (Doc. 15-246, p. 7). Going into the team meeting, Dr. Goodwin was not aware "of many details of K's experience like the pseudo seizures and the apparent debilitating effect that they had upon K." (Doc. 15-246, p. 7). The hearing officer noted that after Dr. Goodwin saw the video of K.M.'s altercation with her mother and learned about K.M.'s pseudo seizures, Dr. Goodwin "stated that [K.M.] would indeed need academic support." (Doc. 15-246, p. 7; *see* Doc. 15-3, pp. 301-302).[4]

The hearing officer faulted the eligibility team for failing to consider Ms. Vines's opinions and emphasized the significance of Ms. Vines's opinions: "Ms. Vines, . . . who had earlier diagnosed [K.M.] with PTSD and conversion disorder, has significant experience with trauma and abused adolescents so would possibly been [sic] a significant voice for the team to consider." (Doc. 15-246, p. 8). The hearing officer noted that the Board had a letter from Ms. Vines in which she offered to provide additional information, but the Board did not seek input from Ms. Vines,

---

[4] Dr. Goodwin stated that K.M. "needs support in the academic setting". (Doc. 15-3, p. 302). Dr. Goodwin added that she still would not opine that K.M. needed specially designed instruction because she was "not sure what that specially designed instruction be. That's where I get stuck. She certainly needs support. She certainly has mental health issues that are involved . . . There is no question about that. That are very intense." (Doc. 5-3, p. 303).

and the hearing officer noted the sarcastic tone of the Board's counsel with respect to Ms. Vines. (Doc. 15-36; Doc. 15-246, p. 8).

Summing up his opinion, the hearing officer stated:

Instead of having a discussion on what types of specialized instruction might be needed to address [K.M.'s] unique needs, there appears to be lining up of the members along the belief that this question was moot since the district had good regular classroom resources and could likely meet her needs there. While this theory is plausible . . . it does appear that the eligibility team fails to rigorously examine this part of the eligibility question. For example, there was no independent educational evaluation nor any apparent effort to ascertain the opinions of Ms. Vines about her diagnosis of [K.M.]. While Dr. Goodwin appears reliable and her integrity is not in question, it does not appear she was afforded enough information leading up to the eligibility meeting to have had her opinion carry the weight afforded it by the team. In short, the record leads the undersigned to question whether or not the team appropriately addressed the question of whether or not specially designed instructions were needed by [K.M.]

(Doc. 15-246, p. 9). The hearing officer stated that "the question of what services are to be laid out in an IEP[] only occurs once a child is found eligible." (Doc. 15-246, p. 7). Commenting again on the Board's circular reasoning, the hearing officer observed that the team "looked around and felt that since they did not conceive of any specially designed instructions that would apply, they felt [K.M.] was not in need of 'specialized instructions.'" (Doc. 15-246, p. 10). It appeared to the hearing officer that the team "presumed a negative since they could not know what else they could do, figuring that a 504 type plan would work well . . . ." (Doc. 15-246, pp. 10-11). The hearing officer noted that K.M. ultimately bore the burden of proof but

directed the Board "to seek further data, presumably in the form of an independent education evaluation with current data, and reconvene the eligibility team," with Ms. Vines's input, and then "reconsider the question of whether or not the child was one in need of specially designed instruction." (Doc. 15-246, p. 12).

The hearing officer repeatedly reiterated that if the Board properly examined the third issue concerning K.M.'s potential need for specialized education and related services, the Board ultimately might conclude that a 504 plan would best serve K.M., but the hearing officer could not accept that conclusion until the Board took the steps necessary to reach that conclusion. The Board's failure to follow the proper process necessarily eliminated a possible finding that K.M. needed specialized education and related services. The hearing officer concluded:

> The Respondent District's eligibility process was correct with respect to two of the three questions . . . On the third question, however, the District appears to have neglected to properly address the possibility that K might be a child in need of specialized instruction. The undersigned does not purport to find that the team was wrong in their answer to that question, rather finds that the process in getting there could have allowed the team to have come to the incorrect conclusion and consequently deny K a FAPE.

(Doc. 15-246, p. 11).

**E.     The Board's Appeal**

To appeal the hearing officer's decision, the Board filed the complaint in this action. (Doc. 1). In its complaint, the Board has asked the Court to set aside the hearing officer's findings and the relief he ordered in the decision. (Doc. 1, p. 12).

Mr. Leventry has asserted a counterclaim, asking the Court to order the Board to comply with the hearing officer's order and to find that Mr. Leventry was the prevailing party and therefore entitled to attorneys' fees. (Doc. 6, p. 10). The Court granted the Board's motion to stay the hearing officer's order pending the outcome of this appeal. (Doc. 25). The Board and Mr. Leventry both moved for summary judgment and judgment on the administrative record. (Docs. 27, 28).

## III.  STANDARD OF REVIEW

A party aggrieved by a hearing officer's "findings and decision" on a due process complaint "shall have the right to bring a civil action" concerning the matter "in a district court of the United States . . . ."  20 U.S.C. § 1415(i)(2)(A).  In that civil action, the parties may request summary disposition of the complaint.  "The usual [Federal Rule of Civil Procedure 56] summary judgment principles do not apply in an IDEA case." *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir. 2003).  Instead, on a motion for summary disposition, a district court must review the hearing officer's specific factual findings for clear error and the officer's legal analysis and conclusions *de novo*. *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1284 (11th Cir. 2008).  A district court "may issue a judgment on the record based 'on the preponderance of the evidence,'. . . even when facts are in dispute." *R.L. v. Miami-Dade Cty. Sch. Bd.*, 757 F.3d 1173, 1178 (11th Cir. 2014) (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)).  And, pursuant to Rule 52 of the Federal

Rules of Civil Procedure, a district court may engage in factfinding, "even on a record bearing evidence tendered in addition to the IDEA administrative record—subject to the requirement that [the district court] accord 'due weight' to administrative findings." *Loren F.*, 349 F.3d at 1314.

When evaluating the administrative findings, a district court "'must be careful not to substitute its judgment for that of the state educational authorities.'" *R.L.*, 757 F.3d at 1178 (quoting *Walker Cty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000)). A district court has "discretion to determine the level of deference it will give to the ALJ's findings." *Sch. Bd. of Collier Cty., Fla. v. K.C.*, 285 F.3d 977, 983 (11th Cir. 2002).

> Courts owe some judicial deference to local administrative agency judgments, *see Deal v. Hamilton County Dept. of Educ.,* 259 F.Supp.2d 687, 691–92 (E.D.Tenn.2003) (When reviewing IEPs, court keeps in mind that state and local administrative agencies are deemed to have expertise in education policy and practice), though that's typically limited to matters calling upon educational expertise. *Zelazny,* 325 F.3d at 728 (The amount of weight due to administrative findings under the IDEA depends on whether the finding is based on educational expertise) (citing *McLaughlin v. Holt Pub. Sch. Bd. of Educ.,* 320 F.3d 663, 669 (6th Cir.2003)). To that end, administrative factfindings "are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." *MM,* 303 F.3d at 531; *see also G v. Fort Bragg Dependent Sch.,* 343 F.3d 295, 302 (4th Cir. 2003).

*Loren F.*, 349 F.3d at 1314 n.5.

Accordingly, a district court has discretion to determine the level of deference it will give to the hearing officer's findings, *K.C.*, 283 F.3d at 983, and a district

court may "accept the ALJ's conclusions that are supported by the record and reject those that are not," *R.L.*, 757 F.3d at 1178 (citing *Loren F.*, 349 F.3d at 1314), as long as the district court explains it reasons for rejecting a conclusion, *R.L.*, 757 F.3d at 1178.

## IV.    DISCUSSION

### A.    The "Actionable Procedural Violation"

The Board argues because the hearing officer stated in his opinion that "it '*appear[ed]*' that the 'eligibility process went off track,' such that 'the process' used '*could* have allowed the team to have come to [an] incorrect conclusion," the hearing officer "did not find a substantive denial of FAPE or an actionable procedural violation under well-established law." (Doc. 27, pp. 25-26; Doc. 31, p. 3) (footnotes omitted) (emphasis in Doc. 31).   The argument ignores the clear import of the hearing officer's decision; the officer found that the Board did not properly engage in the FAPE process. (*See* Doc. 15-245, p. 11) ("Issue 2: Was a FAPE denied the Petitioner by the Respondent in the eligibility process and the subsequent determination that [K.M.] was not eligible for special education services?") (emphasis omitted).  Under the IDEA, when a hearing officer examines a procedural violation, the officer "may find that a child did not receive a [FAPE] if the procedural inadequacies . . . impeded the child's right to a [FAPE]."   20 U.S.C. § 1415(f)(3)(E)(ii)(I).  That is precisely what the hearing officer found in this case.

23

After all, if K.M. was in fact eligible for an IEP, and a procedural defect prevented the Board from reaching that conclusion, then by definition, K.M. was denied a FAPE. *See* 20 U.S.C. § 1415(f)(2)(E)(ii)(I).

## B. The "Needs Specially Designed Instruction" Discussion

As discussed above at the second step of the FAPE process, after the eligibility team determined that K.M. had a disability as defined by Ala. Admin. Code § 290-8-9-.03, the eligibility team had to determine whether K.M. was eligible for an IEP. To make that determination, the team had to consider whether her disability "adversely affect[ed] her academic performance" and whether "'by reason thereof'" she "needed special education." *Durbrow v. Cobb Cty. Sch. Dist.*, 887 F.3d 1182, 1193 (11th Cir. 2018) (quoting 20 U.S.C. § 1401(3)(A) and 34 C.F.R. § 300.8(c)(9)). The eligibility team properly answered the first question in the affirmative. (Doc. 15-85, p. 9). The eligibility team did not properly evaluate the second question. In considering K.M.'s need for special education, i.e. her need for specially designed instruction, the team discussed and ruled out her need for specially designed content or methodology, but the team did not consider as an aspect of a FAPE (as opposed to a 504 plan) K.M.'s need for specially designed delivery of instruction and her related need for psychological and counseling services. 34 C.F.R. § 300.39(b)(3).

The hearing officer explained that the eligibility team's circular reasoning regarding "specially designed instruction" resulted in a flawed procedure: "the team

got to [the "specially designed instruction" question] and looked around and felt that since they did not conceive of any specially designed instructions that would apply, they felt she was not in need of 'specialized instructions.'" (Doc. 15-246, p. 10). Essentially, the Board did not adequately explore whether K.M. "needs special education" because the school representatives on the eligibility team did not fully understand K.M.'s impairment and therefore did not have a basis for exploring whether she needs specialized delivery of instruction.

In this regard, the hearing officer emphasized that Dr. Goodwin, the Board's consulting clinical psychologist, only examined paperwork concerning K.M.; Dr. Goodwin did not meet K.M and was not familiar with K.M.'s pseudo seizures or the effects of those seizures. In addition, the Board did not consider the opinions of Ms. Vines, K.M.'s counselor. The IDEA provides that an eligibility determination must be made by a team of "qualified professionals and the parent of the child." 20 U.S.C. § 1414(b)(4)(A); 34 C.F.R. § 300.306. The eligibility team must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining . . . whether the child is a child with a disability." 20 U.S.C. § 1414(b)(2)(A)(i). The team must ensure that "assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided." 20 U.S.C. § 1414(b)(3)(C). Moreover:

(1) In interpreting evaluation data for the purpose of determining if a child is a child with a disability under § 300.8, and the educational needs of the child, each public agency must—

> (i) Draw upon information from a variety of sources, including aptitude and achievement tests, parent input, and teacher recommendations, as well as information about the child's physical condition, social or cultural background, and adaptive behavior; and

> (ii) Ensure that information obtained from all of these sources is documented and carefully considered.

34 C.F.R. § 300.306(c).

The IDEA does not require particular sources of information. For instance, an eligibility team does not necessarily have to consult a doctor. Rather, qualified individuals on an eligibility team must exercise sound judgment to determine what data is needed to make an eligibility determination. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 59 (2005) ("IDEA relies heavily upon the expertise of school districts to meet its goals."). The Court accepts the hearing officer's conclusion that K.M.'s eligibility team did not properly evaluate whether she needs special education because the team did not consider all relevant sources of information, specifically Ms. Vines's opinions.

In K.M.'s case, given the unique nature and severity of her disability, the hearing officer properly concluded that Ms. Vines was a significant source of relevant information. As the hearing officer stated, "[t]hough she is not a doctor, Ms. Vines . . . had been meeting with and counseling [K.M.] for several months"

before the eligibility team meeting, and, "as the licensed professional counsel who had earlier diagnosed [K.M.] with the PTSD and conversion disorder, has significant experience with trauma and abused adolescents . . . ." (Doc. 15-246, p. 8). Again, conversion disorder is rare, and its implications for a student are not common knowledge among professional educators.

Ms. Vines was more familiar with K.M.'s disability than any member of the eligibility team. As she explained in her March 21, 2016 letter, Ms. Vines worked with K.M. through "regular individual therapy," was aware of K.M.'s "complex stressors," and taught K.M. "many coping strategies." (Doc. 15-36). Although she is not an educator, Ms. Vines could have explained how K.M.'s PTSD and conversion disorder impacted, for example, her ability to retain information and what that might mean in terms of delivery of instruction. *Cf. E.E. v. Tuscaloosa City Bd. of Educ.*, No. 7:15-cv-01370-LSC, 2016 WL 3618362, at *5 (N.D. Ala. July 6, 2016) (information missing from an eligibility team meeting did not deprive student of a FAPE because "such omissions [were] not such as to compel the conclusion that had that information been shared with the team a different result would have been reached").

In addition, the Court accepts the hearing officer's conclusion that Dr. Goodwin did not review enough information for her opinion to carry the weight the Board afforded it. (Doc. 15-246, pp. 7, 9). The IDEA does not require a school

district's consulting psychologist to personally evaluate a student, and the Court does not believe that Dr. Goodwin has personally examined the students for each of the "hundreds, if not thousands" of eligibility teams on which she has served. (Doc. 15-3, p. 269). But in this case, again because of the unique nature and severity of K.M.'s disability, it was reasonable for the hearing officer to expect the eligibility team to consult a psychologist who had personally examined K.M. Because Ms. Vines was not consulted, Dr. Goodwin was the only expert in mental health impairments on the eligibility team. Dr. Goodwin testified that she had no personal knowledge of K.M., never met K.M., and never witnessed any of K.M.'s seizures or panic attacks. (Doc. 15-3, pp. 280-82). Rather, she based her opinions on a review of written assessments and conversations with others who had observed K.M. (Doc. 15-3, p. 287). Indeed, after Dr. Goodwin saw the video of K.M.'s interaction with her (K.M.'s) mother and learned about K.M.'s pseudo seizures, Dr. Goodwin concluded that K.M.'s mental health issues were "very intense" and that K.M. "needs support in the academic setting." (Doc. 15-3, pp. 302-03).

The Board challenges the significance of Ms. Vines's opinions because, according to the Board, Ms. Vines's March 21, 2016 letter "conveyed an all-but-upbeat assessment of [K.M.'s] condition at that time, and, notably, did not include a recommendation for or consideration of an IDEA eligibility referral or an IEP." (Doc. 30, p. 10). The argument is not persuasive. Ms. Vines's letter is not an "all-

but-upbeat assessment." Although she stated, "[K.M.'s] anxiety and panic have stabilized greatly over the past few weeks," and, "[t]here is no need for alarm or panic as there is no medical emergency," Ms. Vines still stated that "there is a possibility that [a pseudo seizure or fainting spell] could occur at school." (Doc. 15-36). Even Ms. Vines could be interpreted as positive, K.M. had seizures, panic attacks, fainting spells, and convulsions after the date of the letter, with the last seizure leading to physical injuries and hospitalization. (*See* Doc. 15-1, pp. 80-81; Doc. 15-2, pp. 142-43, 150-53; Doc. 15-168, pp. 1-2). The letter demonstrates that Ms. Vines was much more familiar with K.M.'s disability than any member of the eligibility team. The Board faults Mr. Leventry and his attorneys for not inviting Ms. Vines to attend the eligibility meeting, (Doc. 30, p. 11), but the IDEA does not place the burden of due process on the parent.

The Board argues that the hearing officer should not have been concerned about Dr. Goodwin's failure to meet K.M. because Dr. Goodwin "was but one member of the eligibility team—and others who knew the Student quite well reached the same conclusion that Dr. Goodwin did." (Doc. 30, p. 11). But Dr. Goodwin was the only psychologist on the eligibility team, and she would have been in a position to contribute substantially more to the team's assessment of K.M. if she had met K.M. and evaluated her.

The Court commends the Board's efforts to support K.M. The administrative

record shows that Board employees took K.M.'s disability seriously, documented K.M.'s struggles and successes, responded promptly to every emergency, provided accommodations throughout the 2015-16 school year, and referred K.M. for an IDEA evaluation. Nevertheless, the administrative record supports the hearing officer's conclusion that the Board denied K.M. a FAPE by failing to properly assess whether K.M. needed specially designed instruction.

## C.   <u>Attorneys' Fees</u>

Mr. Leventry asks the Court to determine that he is the "prevailing party" and therefore entitled to attorneys' fees. (Doc. 28-1, pp. 19-23). The IDEA provides that "[i]n any action or proceeding brought under [20 U.S.C. § 1415], the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B)(i)(I). K.M. has not been found to be a "child with a disability" as defined by the IDEA because the eligibility team has not found that K.M. "needs special education." 20 U.S.C. § 1403(3). Therefore, Mr. Leventry is not entitled to attorneys' fees at this point.

## V.   CONCLUSION

Based on the foregoing, the Court denies the Board's motion for summary judgment and judgment on the administrative record, grants Mr. Leventry's motion for summary judgment and judgment on the administrative record, and affirms the

hearing officer's due process decision.

The Court orders the Board to comply with the hearing officer's final order within 30 days of this order.

**DONE** and **ORDERED** this 16th day of September 2019.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE